IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

KEVIN WOLFE                              PLAINTIFF/COUNTER-DEFENDANT

v.                                       CAUSE NO. 1:13CV104-LG-JMR

TOBACCO EXPRESS II, INC., MARDI
GRAS WINE AND SPIRITS, INC., and                        DEFENDANTS/
SHELIA ANN THOMAS-GATIAN                        COUNTER-PLAINTIFFS

MEMORANDUM OPINION AND ORDER
REGARDING MOTIONS FOR SUMMARY JUDGMENT

BEFORE THE COURT are three motions for summary judgment filed by the parties in this employment-related case. Plaintiff Wolfe claims he worked for defendants Tobacco Express II, Inc. and Thomas-Gatian for an eight-month period and was not paid for his work, in violation of the Fair Labor Standards Act. The Court finds questions of material fact and therefore denies both parties' motions for summary judgment in regard to this claim.

Wolfe also claims that after he was formally hired by Thomas-Gatian to work at Tobacco Express and Mardi Gras Wine and Spirits, Inc., the defendants violated the Employee Polygraph Protection Act by requesting or requiring him to take a polygraph examination and terminating his employment when he refused. The Court finds no question of material fact regarding the EPPA claims. Wolfe prevails on the issue of defendants' liability for the request or requirement that he take a polygraph examination, but defendants prevail on the issue of retaliation for Wolfe's refusal to take the examination.

The defendants claim that Wolfe has converted notebooks containing

business records, cash, and inventory of Tobacco Express. Wolfe has shown that there is no question of material fact regarding this claim, and therefore his motion for summary judgment will be granted. The defendants also move for dismissal of this case as a sanction for spoliation of evidence. The Court finds sanctions inappropriate and therefore this request will be denied.

BACKGROUND

According to his Complaint (ECF No. 1), Wolfe was employed by Tobacco Express, II, Inc. and Mardi Gras Wine and Spirits, Inc. for approximately seventeen months, from February 18, 2011 to July 2, 2012.[1] Both stores are operated and/or owned by defendant Thomas-Gatian.

Wolfe alleges that from February 18 through September 9, 2011, he maintained the same hours at Tobacco Express as his girlfriend, Elizabeth Rutherford,[2] who was employed there as a cashier. Wolfe alleges that even though he restocked coolers, stocked shelves, unloaded trucks, assisted customers and helped Rutherford during that time period, he was not paid for his work. Wolfe was placed on the payroll on September 12, 2011. He worked between thirty-five and forty hours per week, at a wage of eight dollars per hour. Although it is not clear in the Complaint, it appears that Wolfe claims to have been an employee of both

---

[1] Wolfe's Complaint also states that he was employed by the defendants from February 2, 2011 to July 2, 2012. (Compl. 2 (¶3), ECF No. 1).

[2] Rutherford later married Wolfe and is now known as Elizabeth Wolfe. The Court will refer to her by her name at the time of the relevant events to reduce the possibility of confusion.

Tobacco Express and Mardi Gras Wine from September 12, 2011 to July 2, 2012.

In June 2012, the defendants noticed that inventory and cash were missing from Tobacco Express.  In the course of investigating the shortage, the defendants required three employees, including Wolfe and Rutherford, to undergo a polygraph. Each of the three employees was given a 48-hour notice to sign prior to administration of the test.  Wolfe alleges he questioned the legality of the requirement that he submit to the test, but was informed by Thomas-Gatian that he would be terminated immediately if he refused.  Wolfe therefore appeared at the scheduled time for the polygraph test.  However, he refused to take the test when the polygraph examiner notified Wolfe of his rights and that he was not required to take the test to maintain his employment.  Wolfe left the test site and returned to the Mardi Gras Wine store to complete his shift.  He alleges that when he arrived, the manager requested his keys, terminated his employment, and told him to never return to the premises.

In August of 2012, Wolfe made a complaint to the U.S. Department of Labor regarding the polygraph test.  (Pl. Mot. Part. Summ. J. Ex. A 3, ECF No. 114-1). He also complained that he not been paid for six months of work at Tobacco Express.  (*Id*. at 2).  An investigator for the U. S. Department of Labor concluded that although Wolfe was not expressly employed by Tobacco Express from February through September of 2011, Tobacco Express had nonetheless "suffered or permitted" him to work there for the same hours as Rutherford, and therefore he was owed minimum wage for those hours.  (*Id*. at 3).  The parties indicate that the

investigator found no violation of the EPPA, but that portion of the narrative does not appear to be in the record.  Tobacco Express has refused to pay the $8,616.63 in back wages calculated by the investigator for the FSLA violation.

Wolfe brings an EPPA claim against Mardi Gras Wine, Tobacco Express and Thomas-Gatian, for which he seeks damages pursuant to 29 U.S.C. §§ 216(b) and 2005(c).  Additionally, he brings a FLSA claim against Tobacco Express and Thomas-Gatian for unpaid wages in the amount of $8,616.63, plus damages as allowed by 29 U.S.C. § 216(b).

According to the Counterclaim (ECF No. 68), Thomas-Gatian is a principal of Tobacco Express and Mardi Gras Wine, both of which are S corporations.  The businesses are operated out of a single building owned by Thomas-Gatian.  Wolfe was employed as a retail sales clerk from September 2011 until his resignation in June 2012.

Management noticed inventory irregularities in the spring and summer of 2012, primarily involving Tobacco Express.  Three employees, including Wolfe and Rutherford, who were in a position to have regular access to the goods and/or money were offered polygraph examinations.  Rutherford and the other employee took and passed the examination.  Wolfe refused the test, returned to the store, turned in his keys and never returned to work or otherwise communicated with the defendants.  He filed a claim for unemployment benefits, which was denied initially and on appeal on the basis of the finding that Wolfe had not been fired but had voluntarily resigned his employment.  The defendants allege that Wolfe was criminally charged

-4-

by his subsequent employer with embezzlement, giving credence to their suspicions that he was responsible for the inventory losses at Tobacco Express.

The defendants further allege that during this litigation, Wolfe has provided his attorneys with notebooks taken from Tobacco Express which are defendants' business records. The defendants contend these notebooks were created and maintained for management's purposes and contain entries that would substantiate their defense to Wolfe's claims. However, Wolfe has not returned the notebooks to Tobacco Express.

The defendants' counterclaims against Wolfe are for conversion of merchandise, money, and business records. They seek compensatory and punitive damages.

ANALYSIS

In his summary judgment motions, Wolfe seeks judgment in his favor as to the defendants' conversion counterclaims, and as to the liability portion of his own claims against the defendants. The defendants move for summary judgment on all claims against them.

The Court analyzes the motions under the well-established summary judgment standard. Fed. R. Civ. P. 56(c); *see generally, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586–87 (1986); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

Spoliation

The defendants move for dismissal of Wolfe's claims against them as a sanction for spoliation of the evidence.  They argue that Rutherford removed at least five notebooks containing business records from the stores, and although she produced five notebooks in discovery, the notebook containing the manager's comments about Wolfe's presence at the store was not produced.  The manager testified that "I do know that I wrote a lot about [Wolfe] being up there, about complaints that I had received, and I don't see any of that in here."  (Def. Ex. 36 at 35, ECF No. 111-16).  Defendants conclude that Rutherford has not produced or perhaps destroyed at least one notebook.  (*Id*. at 9).

In earlier proceedings in this case, the defendants filed a motion to compel requesting, among other things, that Elizabeth Rutherford be ordered to respond to questions about the notebooks. (ECF No. 67).  The Court granted this motion in part, allowing the defendants to ask Rutherford certain questions about the notebooks.  (Order Jan. 10, 2014, ECF No. 86).  Rutherford's answers were clearly unsatisfactory to defendants, because she testified both that the notebooks were her property because she purchased them, and also that they were store records that she had mistakenly brought home with some of her own items.  (*See* Def. Resp. Ex. 41 at 140-41, ECF No. 119-2).  The defendants argue that there remains at least one other notebook in Rutherford's possession, and her retention of it shows bad faith.  They argue that the notebook is necessary to show that Rutherford received specific instructions from the manager regarding the conditions under which Wolfe

could be on the premises during Rutherford's shifts.  Defendants did not file a

motion to compel production of the notebook(s).

The law regarding spoliation requires that the moving party show that the

party alleged to have concealed or destroyed evidence has acted in bad faith.

*King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003).  The Court should demand

even more compelling evidence of bad faith when asked to apply the more severe

sanction of dismissal or summary judgment.  *Stahl v. Wal-Mart Stores, Inc.*, 47 F.

Supp. 2d 783, 786-87 (S.D. Miss. 1998).

The defendant's request for dismissal on the grounds of spoliation must be

denied.  Rutherford, although closely aligned with Wolfe, is not a party to this

lawsuit.  The Court has not located a case in which a *non-party's* alleged bad faith

has constituted grounds for dismissal for spoliation.  Even so, the evidence

concerning Rutherford's conduct does not unequivocally show bad faith, considering

that she testified to both negligent and knowing removal of the notebooks.  There is

no evidence at all of Wolfe's involvement in the disappearance of the notebooks or

that he knew they were stored in a closet in his home.  Further, the notebook is not

the only source of the information defendants wish to present to the jury, as the

person who created the record has testified that she advised Rutherford of the

circumstances under which Wolfe could remain at the store during Rutherford's

shifts.  (Def. Ex. 36 at 33-34, ECF No. 111-16).  Thus, the evidence has not been

"lost."  Dismissal of the entire case would be inappropriate in any event, because

the documentation sought by the defendants concerns only the FLSA portion of this

case.  The Court will therefore exercise its discretion to deny sanctions based on spoliation of the evidence.

<u>Plaintiff's Fair Labor Standards Act Claim</u>

The FLSA allows injured employees to sue directly on their own behalf under 29 U.S.C. § 216(b), for back pay, plus an equal amount as liquidated damages. *Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1030 (5th Cir. 1993).  In order to establish a claim for failure to compensate under the FLSA, there must first be an employer-employee relationship.  The FLSA defines employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The parties do not dispute the employer status of the corporate entities, but Thomas-Gatian argues she is not an employer under the statute.  She argues that she should not be subjected to individual liability for any FLSA violations, because to do so would improperly pierce the corporate veil.

A shareholder, member, or officer of an entity is not individually liable as an employer simply because of her position.  Instead, the Fifth Circuit Court of Appeals applies an "economic reality" test to determine whether an individual is sufficiently involved in the day-to-day operation of the company and its employees to be considered an employer for FLSA purposes.  *See Gray v. Powers,* 673 F.3d 352, 354-55 (5th Cir. 2012).  "To determine whether an individual or entity is an employer, the court considers whether the alleged employer: (1) possessed the power to hire and fire employees; (2) supervised or controlled employee work schedules or conditions of employment; (3) determined the rate or method of payment; and (4)

maintained employee records." *Id.* at 355 (internal quotations omitted); *see also Watson v. Graves,* 909 F.2d 1549, 1553 (5th Cir. 1990).

When a plaintiff alleges that there is more than one employer, the Court "'must apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test.'" *Gray,* 673 F.3d at 355 (quoting *Watson,* 909 F.2d at 1556)).  And much like piercing the corporate veil, the Fifth Circuit has recognized that "'individuals are ordinarily shielded from personal liability when they do business in a corporate form, and . . . it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA.'" *Id.* at 356 (quoting *Baystate Alt. Staffing, Inc. v. Herman,* 163 F.3d 668, 677 (1st Cir. 1998)).  Only those individuals "who have operating control over employees" may be individually liable for FLSA violations committed by the company.  *Id.* at 357.  *See also Lee v. Coahoma Cnty., Miss.,* 937 F.2d 220, 226 (5th Cir.1991) (noting that the term "employer" includes individuals with managerial responsibilities and substantial control over the terms and conditions of the employee's work).

The evidence in this case establishes that Thomas-Gatian meets the FLSA's definition of an "employer."  She testified that she made all staffing decisions, and was involved in the day-to-day management of employees.  It is evident from her deposition testimony as a whole that she was the decision-maker for all aspects of the businesses.  She therefore qualifies as an "employer" under the FLSA.

Next, the Court must determine if Wolfe is an "employee." The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An entity employs an individual under the FLSA if it "suffer[s] or permit[s]" that individual to work. 29 U.S.C. § 203(g). "Work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. "[A]n employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008).

Wolfe testified that from February to August 2011, he spent the same number of hours as Rutherford at Tobacco Express. He retrieved items for customers, restocked shelves, and did "everything except the processing of the credit cards and physically ringing up the customers." (Def. Ex. 34 at 91, ECF No. 111-14). He testified that management knew he was there, and actually observed him stop in with Rutherford during their off hours to help the manager, who was pregnant at the time, restock the cooler and clean up. (*Id*. at 93-94). He further testified that management praised him on several occasions, telling him "Hey, store looks great. Y'all are doing a good job. Everything looks nice and stocked and straightened and cleaned." (*Id*. at 111). He was never directly asked by anyone to not work in the store when he accompanied Rutherford on her shift. (*Id*. 110-11). The manager told Rutherford that it was okay for Wolfe to be there as long as he stayed away from the cash register area. (*Id*. at 113). Rutherford generally agreed that Wolfe helped her during her shift. (Def. Ex. 35 at 46, ECF No. 111-15).

By contrast, the manager testified that she had several conversations with Rutherford about Wolfe interfering with vendors and customers.  She told Rutherford that Wolfe wouldn't be allowed there anymore if he continued interfering.  (Def. Ex. 36 at 33-34, ECF No. 111-16).  "It was a one-person job. [Rutherford] was the one that worked there.  There was no reason for [Wolfe] to be up there."  (*Id*. at 34).  The manager told Wolfe more than once that he did not work there, "[b]ecause I was getting complaints from the vendors that he was trying to tell them how to do their jobs and complaints from the customers that he was loud and swearing in the store."  (*Id*. at 47).  However, when she was pregnant the manager did ask Rutherford to ask Wolfe to throw a vacuum machine into the dumpster and change out the air filters.  (*Id*. at 54, 59-60).  But her comment praising "y'all" for doing a good job was directed to Rutherford and the vendors, who had primary responsibility for keeping the coolers stocked.  (*Id*. at 80).

Defendant Thomas-Gatian, who did not spend time at the stores, testified that she spoke to Rutherford, and asked her to have Wolfe leave Tobacco Express because of the complaints from vendors and customers.  (Def. Ex. 33 at 11-12, ECF No. 111-13).  Gatian was never informed that Wolfe performed work for Tobacco Express during the time before he was hired in August 2011.  (*Id*.).

Reviewing this evidence in the light most favorable to Wolfe, the Court finds that there are questions of material fact in regard to the FLSA claim.  There is conflicting evidence regarding whether Wolfe was performing work for Tobacco Express between February and August 2011, and if so, whether the employer was

aware of it.  Accordingly, neither party is entitled to summary judgment as to the FLSA claim.

<u>Plaintiff's Employee Polygraph Protection Act Claim</u>

The EPPA makes it unlawful for most non-govermental employers to require an employee to take a polygraph test, or even suggest in any way that the employee do so.  29 U.S.C. § 2002(1).  Employers are also prohibited from discharging or disciplining an employee for any reason related to a polygraph test – even the refusal to take one.  29 U.S.C. § 2002(3).  Wolfe contends that the defendants violated both of these provisions.

*A.  The Polygraph Testing*

The defendants advised Wolfe that he was requested or required to take a polygraph examination by verbally informing him, and providing him with a document titled "48 Hour Notice of Polygraph Examination."  (Def. Mot. Summ. J. Ex. 3, ECF No. 110-3).  There is no question that while he was an employee of Mardi Gras Wine and Tobacco Express, Wolfe's employer requested that he submit to a polygraph test, which is a violation of Section 2002(1) of the EPPA.

However, the defendants claim that their use of polygraph testing was authorized under the ongoing investigation exemption of the EPPA, because it was in conjunction with an ongoing investigation of an apparent theft of cash and/or products from its store.  The exemption, found at Section 2006(d), provides that the EPPA does not prohibit an employer from requesting that an employee take a polygraph examination when:

(1) the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage;

(2) the employee had access to the property that is the subject of the investigation;

(3) the employer has a reasonable suspicion that the employee was involved in the incident or activity under investigation;

(4) the employer executes a statement, provided to the examinee before the test, that—

    (A) sets forth with particularity the specific incident or activity being investigated and the basis for testing particular employees,

    (B) is signed by a person (other than the polygraph examiner) authorized to legally bind the employer,

    (C) is retained by the employer for at least 3 years, and

    (D) contains at a minimum—

        (i) an identification of the specific economic loss or injury to the business of the employer,

        (ii) a statement indicating that the employee had access to the property that is the subject of the investigation, and

        (iii) a statement describing the basis of the employer's reasonable suspicion that the employee was involved in the incident or activity under investigation.

29 U.S.C. § 2006(d).

The regulations explain how to apply the exemption in circumstances like those alleged by the defendants in this case:

[P]olygraph testing in response to inventory shortages would be permitted where additional evidence is obtained through subsequent

> investigation of specific items missing through intentional wrongdoing, and a reasonable suspicion that the employee to be polygraphed was involved in the incident under investigation.  Administering a polygraph test in circumstances where the missing inventory is merely unspecified, statistical shortages, without identification of a specific incident or activity that produced the inventory shortages and a "reasonable suspicion that the employee was involved," would amount to little more than a fishing expedition and is prohibited by the Act.

29 C.F.R. § 801.12(b).

Wolfe argues that the written notice provided by Tobacco Express did not comply with the third and fourth requirements of the ongoing investigation exception.   In regard to the fourth requirement, concerning the contents of the statement, Wolfe argues that the notice provided does not set forth with particularity the specific incident or activity being investigated, nor does it identify the specific economic loss or injury to the employer.

It appears that Wolfe's refusal to take the polygraph examination makes the contents of the notice irrelevant.  Although the Court is unable to locate a case in which the Fifth Circuit Court of Appeals has addressed this issue, the Eleventh Circuit Court of Appeals has determined that in the case of an employee who has refused to take a polygraph test, the fourth requirement of a statement is not applicable.

> The requirement refers not to "employees" but "examinees," that is to say, individuals who will take the proposed tests.  *See Polkey v. Transtecs Corp*., 404 F.3d 1264, 1270 (11th Cir. 2005) (relying on the distinction between "employee" and "examinee" to hold that the notice requirement applies only to individuals who will take lie detector tests).  Because plaintiffs declined to take lie detector tests, they were never "examinees" and so the Company was never obliged to provide them with statements of alleged misconduct.

-14-

*Watson v. Drummond Co., Inc.*, 436 F.3d 1310, 1315 (11th Cir. 2006); *see also*

*Maybury v. Slaton*, No. 3:06cv363, 2010 WL 518041 at *6 (S.D. Ohio Feb. 2, 2010)

(following *Polkey*).  As Wolfe was never an "examinee," the defendants had no

obligation to comply with the requirement of a statement in order for the ongoing

investigation exemption to apply.  Accordingly, the Court will not examine the

contents of the statement and will proceed to Wolfe's arguments concerning the

third exemption requirement.

The third requirement for application of the exemption is that the employer

have a reasonable suspicion that the employee was involved in the incident or

activity under investigation.  The regulations define "reasonable suspicion" as "an

observable, articulable basis in fact which indicates that a particular employee was

involved in, or responsible for, an economic loss."  29 C.F.R. § 801.12(f)(1).

> While access or opportunity, standing alone, does not constitute a basis
> for reasonable suspicion, the totality of circumstances surrounding the
> access or opportunity (such as its unauthorized or unusual nature or
> the fact that access was limited to a single individual) may constitute a
> factor in determining whether there is a reasonable suspicion.

*Id*.

Viewing the evidence in the light most favorable to the plaintiff, it appears

that the defendants have not shown that they are entitled to the ongoing

investigation exemption.  Wolfe had access to the inventory and/or cash that was

the subject of the investigation, and he had the opportunity for theft, as single-

person shifts were the norm at both stores.  But the employer was unable to

articulate a reason for suspecting that Wolfe, in particular, was responsible for the

-15-

missing property.  The owner testified that she just knew it was Wolfe.  ("As far as him actually putting cash in his pocket, I don't know what all Mr. Wolfe did.  But I know he was creative.  And I know that likely happened. . . . it's just my assumption. . . . [b]ased on a lot of experience.") (Def. Ex. 33 at 34-35, ECF No. 111-13).  She could identify no eyewitnesses, video surveillance or business records pointing to Wolfe's culpability.  In the Court's view, that is not sufficient to give rise to reasonable suspicion, as this evidence merely invites the jury to speculate along with Thomas-Gatian.  Accordingly, Wolfe has established that Mardi Gras Wine violated section 2002(1) of the EPPA when it requested or required him to submit to a polygraph test.  His motion for summary judgment as to the liability portion of his Section 2002(1) EPPA claim will be granted.

### B. Wolfe's Termination

Wolfe contends that he was terminated for his refusal to submit to a polygraph test, in violation of section 2002(3) of the EPPA.  The defendants argue that the question of whether Wolfe was terminated from his employment has already been adjudicated by the MDES, when an administrative law judge found that Wolfe was not terminated but had voluntarily quit.[3]  Wolfe responds that the

---

[3]  In regard to Wolfe's employment at Tobacco Express, the ALJ concluded that Wolfe "voluntarily left his employment in order to give his one day a week shift to a co-worker.  The claimant was not under any threat of being discharged."  (Def. Ex. 23 at 1, ECF No. 111-3).  In regard to Wolfe's employment at Mardi Gras Wine, the ALJ concluded that,

> [t]he claimant voluntarily left his employment when he assumed he was being terminated once the manager asked for the claimant's keys and told the claimant to leave the property.  Although the claimant

-16-

anti-retaliation provisions of the EPPA override the preclusive effect of the MDES'

factual finding.

        i.)  Issue Preclusion

The law is clear that "when a state agency acting in a judicial capacity . . .

resolves disputed issues of fact properly before it which the parties have had an

adequate opportunity to litigate, federal courts must give the agency's fact-finding

the same preclusive effect to which it would be entitled in the State's courts." *Univ.*

*of Tenn. v. Elliott,* 478 U.S. 788, 799 (1986) (internal quotation marks, alteration,

and citation omitted).  "Under Mississippi law, res judicata or collateral estoppel

precludes relitigation of administrative decisions."  *Smith v. Univ. of Miss.,* 797 So.

2d 956, 963 (Miss. 2001); *Zimmerman v. Three Rivers Planning & Dev. Dist.,* 747

So. 2d 853, 861 (Miss. Ct. App. 1999).  "'Once an agency decision is made and the

decision remains unappealed beyond the time to appeal, it is barred by

administrative res judicata or collateral estoppel.'"  *A & F Prop., LLC v. Madison*

*Cnty. Bd. Of Sup'rs,* 933 So. 2d 296, 302 (Miss. 2006) (quoting *Zimmerman,* 747 So.

2d at 861).

Wolfe argues that the state agency's factual finding does not preclude his

EPPA retaliation claim, because "state administrative decisions do not have

---

        was told by this same manager two times to contact the owner, the
        claimant failed to do so or return to work.  The claimant was not under
        any prior threat of termination.
(Def. Ex. 24 at 2, ECF No. 111-4).

preclusive effect as to claims for which Congress provided a detailed administrative remedy, such as Title VII and ADEA claims." *Wright v. Custom Ecology, Inc.,* No. 3:11CV760 DPJ–FKB, 2013 WL 1703738, at *5 (S.D. Miss. Apr.19, 2013). *See also Cox v. DeSoto Cnty., Miss.,* 564 F.3d 745, 748-49 (in a case brought under ADEA, collateral estoppel did not apply since Congress included an anti-retaliation section that was implicated by the complaint) (citing *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 110–14 (1991)).  Thus, in a Title VII action, a prior state decision enjoys preclusive effect only if rendered or reviewed by a court; "[a]n administrative decision involving Title VII claims that is not reviewed by a state or federal court may not preclude a subsequent Title VII claim." *Thomas v. La., Dep't. of Social Servs.,* 406 Fed. App'x 890, 894–95 (5th Cir .2010) (citing *Elliott,* 478 U.S. at 796). *See also Roth v. Koppers Indus., Inc.,* 993 F.2d 1058, 1062 (3d Cir. 1993) ("Following *Elliott,* the courts of appeals have unanimously concluded that unreviewed administrative agency findings can never be accorded issue preclusive effect in subsequent Title VII proceedings.")

Wolfe does not bring a Title VII or ADEA claim, and unlike the cases cited directly above, his proceedings at the MDES did not concern *why* he had been terminated, only the more basic question of *whether* he had been terminated. Nevertheless, because the EPPA includes an anti-retaliation provision similar to those in Title VII and the ADEA, the Court finds that the administrative findings of the MDES should not be given preclusive effect.  Similarly to Title VII and the

ADEA, the EPPA is intended to protect employees from an employment practice deemed by Congress to be unfair or discriminatory. The findings of the MDES in Wolfe's case were not reviewed by a state or federal court, and therefore the findings should not preclude this Court's consideration of his EPPA retaliation claim.

        ii.) Retaliation

The Fifth Circuit Court of Appeals has not had an opportunity to address the issue of how to analyze an EPPA retaliation claim on summary judgment. The two appellate courts that have considered the issue have concluded that the mixed-motive analysis developed for other retaliation claims is, at the least, not inappropriate. In *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334 (4th Cir. 2008), the Fourth Circuit held that "on its face, § 2002(3) does not require polygraph results to be the 'sole' basis of an employment decision." *Id.* at 341. Therefore, the court applied the mixed-motive framework, requiring only that a plaintiff show that the results of the polygraph examination (or, in this case, the refusal to take the examination) was a motivating factor in the termination of employment to make a prima facie case of retaliation. *Id.*; *see also Laney v. Getty*, No. 5:12-306-DCR, 2014 WL 1779456 at *3 (E.D. Ky. May 5, 2014). Once the plaintiff has made a prima facie case, the employer can avoid liability by proving that it would have made the same decision regardless. *Worden*, 549 F.3d at 343.

Similarly, in *Bass v. Wendy's of Downtown, Inc.*, 526 F. App'x 599 (6th Cir. 2013), the Sixth Circuit reluctantly approved the mixed-motive framework, stating

that "although it is not clear that [the mixed-motives framework of] *Price Waterhouse* [*v. Hopkins*] is necessarily the appropriate test, the *Price Waterhouse* framework places a relatively light burden on plaintiffs and alternative tests would not aid – indeed they would likely harm – [the plaintiff's] claim." *Bass*, 526 F. App'x at 603.

Regardless of whether the mixed-motive framework is proper for use in an EPPA retaliation case in this Circuit, Wolfe's claim cannot advance beyond the prima facie stage required for any retaliation claim.  The evidence that he was terminated is virtually non-existent.  Although Wolfe's deposition provided a number of opportunities for him to explain why he thought the MDES administrative law judge was incorrect to find that he had left his employment voluntarily, the matter was never directly addressed.  The exchange that comes closest is where Wolfe was asked:

> And so even after the Department of Labor found that there had been no violation of the EEPA and even though the [MDES] found after two hearings in a judgment that's now final that you weren't discharged, that you left voluntarily so as to disqualify yourself for unemployment benefits, you still wanted to file this suit against Ms. Thomas for what you claim is a violation of the EPPA, is that right?

Wolfe answered:

> Yes, I did and because of the fact that the statements that were given in these documents here from the [MDES] here, Exhibit 13, there are handwritten remarks on the bottom basically stating that I had showed up late, yelling profanity and turning in – I can't read that. It's missing – it's incomplete, but to the part of me showing up late, yelling profanity did not happen because during the hearing when that question was asked by the judge, Ms. Gwen Killibrew did answer that no, that did not happen.  I was not cursing and I did not use profanity

in any way, shape, or form.

(Pl. Dep. 86-87, ECF No. 111-14).  Thus, he objected to the language regarding his conduct, but not the conclusion that he had voluntarily quit.

Wolfe points to the deposition testimony of Elizabeth Lottman, an employee on duty at the time Wolfe returned to the store after refusing to take the polygraph test.  Lottman testified that Wolfe was advised by Killibrew that "until everything was cleared up, because he didn't take his test, that he needed to leave the property just for the moment, nothing about being fired, anything like that."  (Def. Ex. 38 at 17, ECF No. 111-19).  Wolfe also points to the deposition testimony of Melanie Eshbaugh, the manager of Tobacco Express at the time.  Eshbaugh testified that Thomas-Gatian told her that Wolfe had been fired.  (Def. Ex. 36 at 66, ECF No. 111-16).  Eshbaugh clarified that Thomas-Gatian did not say "I fired him," but only that "he wasn't working there anymore."  (*Id.*).  However, this testimony is in response to a question about whether Thomas-Gatian told Eshbaugh why Wolfe had filed a lawsuit.[4]  (*Id.* at 65).

On the opposing side of the issue, Thomas-Gatian testified that she did not terminate Wolfe.  (Def. Ex. 33 at 118, ECF No. 111-13).   Thomas-Gatian testified that she got a phone call from Killibrew on the night of the polygraph testing, after Wolfe returned to the store.  Killibrew advised Thomas-Gatian that she was going down to the store because Wolfe was being disruptive. (Def. Ex. 33 at 120, ECF No.

---

[4]  It is reasonable to expect that Thomas-Gatian would eventually terminate Wolfe's employment when he did not appear for work.

111-13).  Thomas-Gatian's testimony regarding the exchange between Killibrew and Wolfe is similar to Lottman's, above, but is obviously second-hand.[5]  Also relevant are the factual findings of the MDES, which constitute competent summary judgment evidence that Wolfe was not terminated, but voluntarily quit.

Viewing the evidence in the light most favorable to Wolfe, the Court finds insufficient competent summary judgment evidence supporting Wolfe's claim that he was terminated from his employment.  Although he clearly understood that termination was a possibility if he refused the polygraph test, Wolfe did not testify that he had been terminated.  No other witness testified that he was told he was terminated when he appeared at the store for the last time.  Without evidence that he was terminated from his employment, Wolfe cannot establish a prima facie case of retaliation for refusal to submit to a polygraph examination.  Accordingly, the defendants will be granted summary judgment on this claim.

Defendants' Conversion Claims

To establish the tort of conversion in Mississippi, "there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand."  *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So.2d 767, 772-73 (¶ 10) (Miss. 2004) (quoting  *Smith v. Franklin Custodian Funds, Inc.*, 726 So. 2d 144, 149 (¶ 20) (Miss. 1998)).  The intent required does not have to be that of a

---

[5]   Killebrew's deposition testimony does not reach the issue of whether she told Wolfe he was or would be fired.  (Def. Ex. 37, ECF Nos. 111-17, 111-18).

wrongdoer. *Id.* at 774 (¶ 15) (citing *First Investors Corp. v. Rayner*, 738 So. 2d 228, 235 (¶ 28) (Miss. 1999)). Wolfe argues that the defendants have no evidence that he was involved in the theft of business records, merchandise, or money from the businesses, and therefore defendants have failed to establish any of their conversion claims.

The defendants point to Rutherford's testimony, where she states that she took the business records, which are "store notebooks" normally kept at the business for the purpose of communicating between shifts. (Def. Ex. 41, at 140-141, ECF No. 119-2). However, Rutherford asserted that the notebooks belong to her, because she paid for them. (*Id.* at 136) ("I said I paid for it and for the most part, yes, sir. I was never reimbursed for it. Therefore, it is mine."). Rutherford found them in a box in the back of her closet at home, but did not know when she brought them from the store. (*Id.* at 146-47). The defendants attempt to impute this evidence concerning Rutherford to Wolfe by pointing out that Wolfe and Rutherford live together, and therefore he shares access to the closet. A conversion requires an intent to exercise dominion or control of another's property. *Greenline Equip. Co., Inc. v. Covington Cnty. Bank*, 873 So. 2d 950, 954 (Miss. 2002). The defendants have not shown that Wolfe was aware of the notebooks, and therefore cannot show his intent to wrongfully possess them. Further, although the defendants provide some evidence of inventory and cash shortages, they point to no evidence that Wolfe was at fault and wrongfully possessed any property belonging to them. The evidence presented is therefore insufficient to create a question of fact as to whether

-23-

Wolfe converted defendants' property.  Wolfe is entitled to judgment as a matter of law in regard to the defendants' conversion claims.

CONCLUSION

The Court concludes that the defendants have not shown they are entitled to dismissal as a sanction for spoliation of evidence.  Their request for dismissal will be denied.

Wolfe has shown there is no question of material fact regarding the defendants' conversion counterclaims.  Summary judgment will therefore be granted in Wolfe's favor on defendants' counterclaims.

The Court finds questions of material fact regarding Wolfe's FLSA claim, and therefore neither party is entitled to summary judgment.

As to Wolfe's EPPA claims, the Court finds no question of material fact. Wolfe has shown a violation of Section 2002(1).  He is entitled to summary judgment as to liability on this claim.  Wolfe has not shown a violation of Section 2002(3), and therefore his motion for summary judgment will be denied and the defendant's motion will be granted.

As a result of these rulings, the remaining issues for trial are: 1) whether defendants violated the FLSA and any resulting damages; and 2) damages for defendants' violation of Section 2002(1) of the EPPA.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion [110] for Summary Judgment filed by the defendants, Mardi Gras Wine and Spirits, Inc., Sheila Ann Thomas-Gatian, and Tobacco Express, II, Inc., is **GRANTED IN PART**

-24-

**AND DENIED IN PART** as set out above.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion [113] for Partial Summary Judgment filed by plaintiff Kevin Wolfe is **GRANTED IN PART AND DENIED IN PART** as set out above.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion [115] for Summary Judgment filed by plaintiff Kevin Wolfe is **GRANTED**.  Defendants' counterclaims against Wolfe are **DISMISSED**.

**SO ORDERED AND ADJUDGED** this the 16th day of June, 2014.


s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE